### BRODIE VS. MOSEBY.

On the 4th of June, 1851, the defendant obtained a levee contract in part upon his own land, with the intention of securing a preferred right, under the 4th section of the act of 11th of January, 1851, to purchase the lands in the rear—made application for the purchase in payment of his levee work in 1852, obtained the acceptance of his work after the act of 12th January, 1853, and was paid in levee scrip, with which he made application to enter the lands, which was refused because they were not then confirmed—in May, 1856, after the confirmation, he entered the land, without its having been offered for sale, with his levee scrip, and upon a patent being issued to the state, obtained the deed of the governor. On the 9th of August, 1855, immediately after the lands, embraced in the same confirmation as those in controversy, were advertised and offered for sale—though the land agent did not offer these lands, having previously permitted their entry by the defendant—the complainant made application to enter the lands at private sale, which being refused, he filed his bill to divest the defendant of the legal title, and vest it in himself: *Held*, that the entry of the lands by the defendant was within the equity of the statute—if irregular, it was ratified by the deed of the governor—that his title was a perfect, legal title, based on a strong equitable foundation, and could not be affected by the claim of the complainant, in which there is no equity.

*Appeal from Jefferson Circuit Court in Chancery.*

Hon. JOHN C. MURRAY, Circuit Judge.

HEMPSTEAD, for the appellant.

Conceding, for argument sake, that upon the completion of the whole or part of the work under his contract, the defendant would have had a right to select land in kind, and might have selected rear lands—if you please, the lands in controversy—in payment, he must have furnished the numbers to the commissioners, and obtained certificates; yet he had an option, and chose to receive compensation in scrip. And his election being thus made and determined, he never could, afterwards, set up any "preference right" to rear or any other lands; but only had the same general right to purchase that every person had who was never a levee contractor at all. He had no more right to buy than Brodie, and neither could lawfully purchase at private entry before the public sale was closed.

This construction of the law has received the deliberate approbation of this court in *McGehee vs. Mathis, MSS. January Term,* 1860: "According to the plain provisions of the act of " 1851, the contractor might," said the court, "take land in kind " or take land scrip. It was left to his choice to do either. *
" * * * To take land in kind was one thing, and to " take scrip was quite another. If the contractor took land, he " became a purchaser, and acquired the exemption [from tax.] " But if he took scrip, he did not become a purchaser, and did " not acquire the exemption."

The reasoning of the court in that case must be decisive of this question, for surely after the election of Moseby to take scrip, any right or preference he might have had touching land, was at an end; unless this court should be prepared to say that he was entitled to scrip and land too.

Brodie having applied to purchase the land, and made a tender of the amount required for that purpose, after the public sale, did everything which he could do to vest a right in himself to the land, [*Lytle vs. State of Arkansas,* 9 *How. S. C. R.* 333,] and it became vested from that time, and must prevail, unless it shall be found that the title of Moseby is paramount.

And Brodie's right to apply to a court of equity by bill to

divest the legal title obtained by Moseby, and have it vested in himself, can admit of no question, nor do I understand it to be denied. 2 *Op. and Inst., p.* 4, *No.* 6; *No.* 15, *p.* 16.

The present Chief Justice of the Supreme Court of the United States, (Judge TANEY,) when secretary of the treasury, constantly announced and acted on the doctrine that persons claiming rights to land, might offer to perform what was necessary to assert their titles, and if they had legal rights, the refusal of the officers to allow an entry or receive the purchase money, will not debar them from asserting their claims in a court of justice. 2 *Op. No.* 534, *p.* 588; *Pintard vs. Goodloe,* 1 *Hemp.* 502; *S. C.* 12 *How. S. C. R.* 24; *Wynn vs. Garland,* 16 *Ark.* 440; *Wynn vs. Morris, id.* 414; *Barnard's heirs vs. Ashley's heirs,* 18 *How. S. C. Rep.* 43; *Cunningham vs. Ashley,* 14 *How. S. C. Rep.* 377; *Moyer vs. McCullough,* 1 *Smith's (Ind.) R.* 211; *Hester vs. Kimbrough,* 12 *S. & M.* 669.

If a patent is issued to one not entitled to it, he is trustee of him who is entitled (*Stark vs. Mather, Walker's (Miss.) R.* 181,) and in all such cases, the party holds the naked legal title for the benefit of the person legally entitled thereto.

WATKINS & GALLAGHER, for the appellee.

The points in this case on the part of Moseby, are :

I. That he was a settler, owner of land fronting on levee, took the contract and built the levee, in order to secure the back lands, and acquired a pre-emptive right to them, within the object and spirit and meaning of the acts of January, 1851.

II. Before the levee was completed, surveyed and accepted, the system as established by the acts of January, 1851, was changed to the issuance of scrip, and all lands had to be sold for that (dollar) scrip or money ; and no provision was made by the new system for contractors under the old law in respect of their taking the back lands under the pre-emptive right granted by the said act of January, 1851 ; and the land agents were not empowered to sell or allow to be located any lands not confirmed.

Moseby had no alternative but to take scrip, and wait for confirmation; but had filed in 1852, (before the enactment of the laws changing the system,) his application to the *commissioners*, for *this* specific land in payment for that levee work, and at the earliest opportunity, paid for the land with the identical scrip issued to him for that levee work. Thus he comes within all the *equities* of the law.

III. Brodie has no equities whatever, but his claim is so inequitable, and so unjust to Moseby, that he cannot succeed, unless his claim be sustained *strictissimi juris*.

IV. The State has received and holds Moseby's labor and money in payment for this land; and has conveyed to him all the title she had to it. He had all the equities before. The State is no party here, and does not complain.

V. Brodie has no title—and unless he has a superior right vested under law, *i. e.* one which he could enforce as against the State, so as to recover a title, supposing the State could be sued, he has no pretence for assailing the title or right of any grantee of the State, even if illegal or bad, because nothing would enure to his benefit thereby, and no party could complain but the State.

Brodie's only pretence of right, is by virtue of his application to purchase; and this pretence of right is based solely on the position that the *advertisement* is a sufficient *offering* under the law; and though, as in this case, there was no actual offering on the day of sale, that after the sale day, the lands were subject to purchase on application.

Mr. Justice FAIRCHILD delivered the opinion of the Court.

On the 4th June, 1851, Moseby, the defendant to the bill filed in this case, and appellee in this court, entered into obligation with Creed Taylor, a swamp land commissioner, to make a levee, on levee section thirty-eight, in Jefferson county, on the north side of the Arkansas river, as the same had been located by the commissioner. The levee was to be made upon lands owned by Moseby, though extending upon adjacent lands, and

in their rear and adjacent to them, are the south-west quarter of section twelve and section thirteen, in township, three south, of range ten west, which are the lands in controversy. Moseby alleges that his object in making the contract to do the levee work was to secure a preference right to purchase these lands, having been informed that, as a levee contractor, he would have such right. And this expectation was a reasonable one, under the 4th section of the act of 11th January, 1851, relating to the subject of reclaiming the swamp lands donated to the State by the United States. Under the act referred to, and that of the 6th of January, 1851, the one being supplementary to the other, Moseby could have taken his pay, for the labor done under his contract, in the rear and adjacent lands to his own, but he did not finish the work, or did not procure it to be accepted and estimated, till after the act of 12th of January, 1853, was passed, by which the system of payment for levee work was changed, whereby accounts therefor were to be audited by the commissioners, presented to the auditor, who was to issue warrants for the amounts of the accounts, which the treasurer was to take up with money, derived from the sale of swamp lands, or with scrip, which was to be receivable in payment for swamp lands at public sale, or private entry. *Act 12th January*, 1853, *amendatory of laws regulating landed interests, section* 27. Under this last law, Moseby obtained scrip for his levee work, it being issued in June and July, 1854, soon after his accounts were closed with the swamp land commissioners.

Under the law as enacted in 1851, the levee contractor could receive in payment for his work particular lands that had been reclaimed, or scrip representing quarter section tracts of land, which might be located upon any of the unsettled portions of swamp lands. But under the law, as modified by subsequent acts, the land scrip was made to represent dollars and cents, and this was the kind of scrip that was issued by the treasurer of the State, the ·scrip representing land in quarter sections being issued by the swamp land commissioners.

Moseby contends that in taking scrip for his levee work, he

did not intend to relinquish his right to be the preferred pur-
chaser of the lands in controversy, that he only took the scrip,
as a mode of settlement of his work, intending to apply it to
the purchase of the lands, for which he had always intended
his levee contract to be available, and because the law obliged
him to do so; such being the legal effect of the act of 12th
January, 1853, or being so considered and acted upon by the
officers who had the administration of the swamp land laws, by
whose opinion and advice Moseby represents himself to have
been guided.

It must be conceded that Moseby has acted throughout his
whole course of conduct, with relation to these lands, consis-
tently with his avowed object to become their purchaser, and
their preferred purchaser, under the act of 11th January, 1851.
When he obtained his contract in June, 1851, to make a levee,
it must have been soon after the work was ready for contract:
he took that section of the levee line that was in front of these
lands: he did it, as he says, with the express intention of saving
these lands for an addition to his plantation, which he needed;
under a custom observed by the sub-commissioner of his dis-
trict, he made and filed his application in June, 1852, for the
entry of these lands, except eighty acres, in payment of his
work, to be done under the particular contract for levee section
No. 38—and procured the lands to be marked on the plats in
the office, as having been applied for by him; in June and July,
1854, as soon as he made his settlement with the commission-
ers, he obtained his scrip, and, with the view of putting it on
the land; in September, 1854, he claimed, to Carroll, the land
agent, to whom had been committed the sale of the lands, the
right to enter them as levee contractor, upon his application
before made, and then on file in the office, which was not
granted, because the lands were not confirmed: the lands were
confirmed to the State as swamp lands, in February, 1855, and
in May, 1855, and, it would seem, as soon as the lists could be
transferred to the office at Pine Bluff, he repeated his claim to
enter the lands as a levee contractor, which was sustained, and

he entered them with the scrip which he had received for his levee work, and which he had kept to be so applied; in November, 1856, the lands were patented to the State by the United States, and in May, 1857, he procured the deed of the Governor, thus ending his prompt and persistent efforts, as he always intended they should be ended, with the investiture of the title of the lands.

If Moseby has not secured the right to the lands it is because he has been misadvised, for as he understood the law, he has been active and continuous in his efforts to gain their preferred purchase, as a levee contractor, under the act of 11th January, 1851.

Brodie, however, contends that, by taking scrip for his levee work, Moseby elected not to take payment in the lands, and that his entry was void, as he had no superior right of entry to any other person, as the lands could not be entered till they had been exhibited to public sale; and that Brodie's own right being founded on an application to enter the lands immediately after the land agent had closed his public sale, is a better right than that of Moseby, who having the legal title without right, must yield it to Brodie, who is entitled to it by right of his application.

Moseby does not equitably fall within the principle of *Mc-Gehee vs. Mathis*, 21 *Ark.*, 59, as he never received the scrip instead of the lands in payment of his levee work, with the intent to use the scrip in any way but as a method of securing the lands for the work, by putting the very scrip he received upon the very lands for whose purchase he took the levee contract. He never relinquished his claim to have the lands in payment of his work, he never did any thing that he thought was a relinquishment, or weakening, of his claim, he only took the scrip as a step towards getting his pay in the lands, which, without the change in the law, he could have got without such intermediate step.

In pursuance with his intention, when he entered into the contract, and in continuation of his effort to secure the lands

by application to the sub-commissioner, Walker, in June, 1852, Moseby, as soon as his work was finished and estimated, had his accounts audited by the commissioners, and because they would not give him the land for the accounts, to procure the land with scrip, which he supposed was the only way open to reach the same end, he exchanged his adjusted accounts for Auditor's warrants upon the treasury, and them he turned into treasury certificates, or scrip, with which to cover the lands.

Neither is Moseby's case like that of Frazier, in *Deloach vs. Brownfield*, 22 *Ark.*, for he took his scrip as a marketable commodity, he did not take his levee contract, or scrip in its discharge, with a view to secure the lands he applied to enter; that is, such facts are not apparent in the case, while it is a part of the case that Frazier did not show that he owned the lands in front of the lands whose entry was controverted in that suit.

From the facts in this case, we are not satisfied that, by the letter of the statutes upon swamp lands, Moseby was debarred from his original right to purchase the lands in payment of his levee work, by taking scrip in the way he did, or that his taking and application of the scrip was anything but a circuitous mode of obtaining payment in lands for his levee work. And we are sure that his case is within the equity of the statute.

Moseby's entry of the lands was made the 19th of May, 1855; Brodie's application to enter the lands was made upon the 9th of August, 1855, which is the beginning of his claim. The entry was ratified by the state, by the issuance of her patent to Moseby, and though his entry had been irregular, we do not see how Brodie can object to it, unless it had violated an equity which he had in the lands, that was subsisting at the date of Moseby's entry.

But Brodie has no equity. He would have had a legal right to have bought the lands at private entry, on the 8th of August, 1855, or any subsequent day after they had been offered at public sale by the land agent, and had not been sold. These lands were not offered for sale, as Mills, the land agent, positively

swears, they were not then subject to private entry, and Brodie's application to enter them, irrespective of Moseby's claim, cannot support his suit. If Moseby's patent could be canceled, Brodie has no claim upon the lands, but they would have to be exposed to public sale, and if so exposed and unsold, he would have the same right as any other man, who might be willing to pay for the lands, to endeavor to purchase them at private entry. *Act of 12th January*, 1853, *secs.* 8, 12.

In *Deloach vs. Brownfield*, the lands had been offered at public sale, were not sold for want of bidders, and Brownfield and Watkins afterwards made their entry—from having the legal title unopposed by any equity, their title was undisturbed by this court.

If Brodie had been permitted to make his entry he would have had only a claim subsequent to that of Moseby. If as in *Bacon's ad. vs. Tate*, decided at the present term, two swamp land patents had issued, one each to Moseby and to Brodie, and the legal titles had balanced each other, the equity of Moseby would have made his the better title. But when Brodie's claim, as we have seen, is not a legal title, is not a legal claim, and has no support in equity, it cannot prevail over a perfect legal title that is based upon a strong equitable foundation. The north half of the southwest quarter of section twelve does not stand on the same footing as the other lands, as the entry of Moseby is his first specific step towards that piece of land, but he is entitled to it under his prior right.

The judgment of the Circuit Court of Jefferson county sitting in chancery, dismissing the bill for want of equity, is affirmed.